UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

FELICIANO ET AL.,

Plaintiffs,

v.

JPJ FRANKLIN LLC ET AL.,

Defendants.

Docket No. 1:25-cv-01929-RER-LKE

Brooklyn, New York
Thursday, August 14, 2025

TRANSCRIPT OF PRE MOTION CONFERENCE
BEFORE THE HONORABLE RAMON E. REYES, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: Kessler Matura P.C.
GARRETT D. KASKE, ESQ.
534 Broadhollow Road
Suite 275
Melville, New York 11747
631-499-9100

Werman Salas P.C.
SALLY JASMINE ABRAHAMSON, ESQ.
609 H Street Northeast
4th Floor
Washington, D.C. 20002
202-830-2016

For the Defendants: Sage Legal LLC
EMANUEL KATAEV, ESQ.
18211 Jamaica Avenue
Jamaica, New York 11423
718-412-2421

Transcription Service: Superior Reporting Services LLC
P.O. Box 5032
Maryville, TN 37802
865-344-3150

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

P R O C E E D I N G S

THE CLERK: Civil cause for pre-motion conference in 25-cv-1929, Feliciano, et al. versus JPJ Franklin, LLC, et al., before the Honorable Ramon E. Reyes, United States District Judge, presiding.

Counsel for Plaintiffs, please state your name.

MR. KASKE: Good morning, Your Honor. This is Garrett Kaske from the law firm of Kessler Matura, for Plaintiff.

THE COURT: Good morning.

MS. ABRAHAMSON: Good morning. Sally Abrahamson from Werman Salas, also on behalf of Plaintiffs.

THE COURT: Good morning.

And counsel for Defendants.

MR. KATAEV: Emanuel Kataev of Sage Legal LLC for the Defendants. Good morning, Your Honor.

THE COURT: Good morning.

This is Defendants' proposed motion, so why don't you tell me about it, Mr. Kataev?

MR. KATAEV: Yes, Your Honor. The Fair Labor Standards Act provides that employer shall pay to each of his employees not less than the minimum wage, and it does not specify when it must be paid. It only requires that the wages be paid in a timely fashion. The complaint alleges here that they were paid weekly, but meekly suggests, through

inference and innuendo that somehow the checks were held, that they were paid a week later than originally intended. This makes no sense for a lot of reasons.

THE COURT: Why doesn't it make any sense?

MR. KATAEV: For one thing, Your Honor --

THE COURT: The employer gets to hold onto the money for an extra week and earn whatever meager interest they're paying these days on bank accounts.

MR. KATAEV: Your Honor, this is not a sophisticated (indiscernible) who's earning interest on his bank account. Courts are permitted to read complaint allegations and utilize common sense. The reason why biweekly payroll is done is to save money on the printing and labor involved in printing paychecks. It's a cost-savings measure for payroll costs in the sense that you'd pay a payroll company to print those checks. It makes absolutely no sense to print weekly checks but hold onto the money. And I just don't --

THE COURT: I don't know that I agree with that. But there are also manual laborers, and the labor law requires them to be paid weekly.

MR. KATAEV: Correct. No disagreement there. My point is --

THE COURT: So if we take supplemental jurisdiction over this, over the labor law claims, you've got a problem.

Your client has a problem.

MR. KATAEV: I disagree. I don't think there's a problem. The complaint doesn't say that the employer failed to pay them on a weekly basis. The complaint suggests that the employer may have held onto these checks even though they're printed weekly. It makes no sense to me. I don't think there's enough there. I think they need more in there to show that --

THE COURT: This is a motion to dismiss.

MR. KATAEV: For failure to state a claim. Correct.

THE COURT: Right. So the allegations in the complaint are deemed to be true. And if they're making that allegation that although the checks were dated weekly, they weren't given weekly, they were given biweekly, we're stuck with that, and that states at the very least a valid labor law claim.

MR. KATAEV: I'm not sure. The complaint says that, "Despite purporting to issue weekly paychecks, Defendants withheld every other weekly paycheck for an extra week, and as a result, they only provided paychecks on a biweekly basis." First and foremost, that generalized allegations isn't sufficient. The Fair Labor Standards Act requires that the Plaintiff provide an example of at least one week in which they were not properly paid. These kind of

generalized allegations have been rejected repeatedly by the Second Circuit in the trilogy of cases of Dejesus, Nakahata, and Lundy.

I recently, a few years ago, prevailed in the Second Circuit after obtaining a dismissal for a similar claim, for overtime, not for not paying timely, where there were similar generalized allegations --

THE COURT: The Lundy line of cases concern the -- if I'm remembering it correctly, the number of hours worked in a pay period, not a pay frequency argument. And even aside from that, the specific allegations here, you know, they don't have to say, "On June 1st, I was given both checks for, you know, May whatever week and the June week." You know, it doesn't have to be that specific. I mean, we have allegations from both of the Plaintiffs on when they were working, the period of employment, and "I didn't get weekly checks. I got them every other week, two checks." I see that as being fine.

MR. KATAEV: I don't know. I'm looking at paragraph 35 and paragraph 18. Mirror images of each other. One for each Plaintiff. "Defendants prepared" --

THE COURT: Hold on just one second. 35 and 18. I want to pull that up.

Yeah. 35 and 18, you said?

MR. KATAEV: Yes, Your Honor. "Defendants prepared

Plaintiffs' checks on a weekly basis, but only provided the paychecks to the Plaintiff on a biweekly basis. As a result, they failed to pay every week."

There are so many issues with this. Even accepting these allegations as true, they don't provide sufficient detail to really hone in on the fact that they failed to pay every week. This is a conclusory statement. They have to provide more information. They have to state, you know, at least one example based on Lundy, Nakahata, and Dejesus.

THE COURT: What case stands for that proposition that they have to give one specific example of the frequency of pay?

MR. KATAEV: There is no case like that, but I'm arguing by analogy, Your Honor, this is insufficient because it's not clear. You know, what about direct deposit? Did they reject direct deposit? You know, were they receiving --

THE COURT: Okay. You're asking for far too much specificity. The federal courts are on notice pleading. This is -- I consider it to be ample notice of a pay frequency claim. They weren't paid every week. They were paid every other week during their period of employment. That's enough. Discovery can reveal the specifics. Yeah.

So why don't you tell me about the rest of your motion?

MR. KATAEV: My other aspect of my motion is that

there is -- the Court should exercise its discretion against making supplemental jurisdiction over the Fair Workweek Law claims. The frequency of pay issue is completely separate and apart from how they were scheduled to work. There is no common nucleus of operative facts there. Their receiving their schedules has nothing to do with when they are paid. It's a completely separate claim.

There are no overlapping facts at all with respect to that. This piggybacking is inappropriate. There's no federal claims that it's tied to. And based on that, those claims should drop too, without prejudice. Which to pursue it in state court, they're welcome to do so. I'm not even sure they can do it in state court.

THE COURT: Mr. Kaske, you want to respond to that?

MR. KASKE: Yeah. I would say, Your Honor, that this situation is very different than those I know the Court has dealt with in the past, where someone brings, for example, a discrimination claim and a wage-an-hour claim together. And although there may be some same actors involved in the underlying baseline of the fact that, you know, it's the same workplace, the incidents that led to the violations are completely different.

This is a situation where the heart of a late payment claim is that folks were scheduled to work, did work, and then were not paid on time, okay? Which involves

discovery and information from managers, from the payroll system, and from the scheduling processes that they use.

The related issue is that the Fair Workweek claims revolve -- the front half of the Fair Labor Standards Act case, right, of the fact that folks were scheduled to work certain shifts, when were they scheduled?, and did they work those shifts? And if so, what were they paid? Which then brings us into the payroll portion of the Fair Labor Standards Act case.

So this is one in which it's not just the employment relationship that Plaintiffs are claiming constitutes the operative facts, right, the common nucleus of operative facts, but rather it's the entire payroll process that is at issue in both claims. When were people working? When were they told they worked? Did they work those shifts? And what were they paid?

THE COURT: Mr. Kataev, is there anything else you want to raise about your motion?

MR. KATAEV: Yes. Although I understand the Court's position on it, I do still wish to proceed with the motion. That's the first part. As to the second part, I think Counsel's description of the flow of the claims, you know, we start with the frequency, we start with when they were scheduled, and then we move into when they were paid, demonstrates that there's no common nucleus of operative

facts, because there's one issue and then there's another issue. And because of that, the Court should not exercise supplemental jurisdiction --

THE COURT: Okay. Let me ask you a question, Mr. Kaske. I was looking at the complaint before we got on the call.

MR. KASKE: Yes, Your Honor.

THE COURT: And I noticed the collective allegations in the class -- not the allegations. The definition of the collective and the class and the Rule 23 class, and it's pretty broad. I'm wondering about, like, what happened? Where did these two Plaintiffs work, physically? Was it the same Checkers --

MR. KASKE: Yeah.

THE COURT: -- location or two different ones?

MR. KASKE: So the two Plaintiffs worked at two different Checkers locations. We've named three Checkers locations that are all commonly owned by -- that are all located in New York City that are all owned by the same individual. We made allegations in the complaint as well about some of the interrelated management processes here, just, you know, to demonstrate to the Court that there are common connections, in addition to the policies, but also to, like, management and such for the three related entities. You know, the complaint isn't going after all Checkers in the

state. It's just these three that are held by this specific franchise owner. Franchisee.

THE COURT: You have no Plaintiff that worked in the third location?

MR. KASKE: Correct.

THE COURT: What evidence do you have that that third location had the same pay practice?

MR. KASKE: In the complaint, we don't have any, you know, direct evidence from a Plaintiff related to that. In our own investigation, we feel confident that, through discovery, we'll be able to show that there were the same practices going on at that other location. But specifically in allegations in the complaint for which you can take an inference that there are common policies across all three entities, and the fact that, you know, we've named two of three that were all owned by the same individuals. I would direct the Court to the allegations starting in 59 and running through 75.

And you know, some of the, I think, key facts there are that Mr. Josan (ph.) was a member of all three Defendants. He's an owner of each Defendant. You know, he holds himself out to be the owner of each Defendant. He has franchise agreements with Checkers, you know, big Checkers. With regards to these Defendants as well that employees were transferred between the Defendant locations, the three at

issue and that they share a common operations manager, who was hired by Mr. Josan as well. And Mr. Josan visits all the stores.

I think from those allegations, I think it's easy to make an inference that the entity at which we do currently have a named Plaintiff working there in the complaint, that they were working under the same payroll and scheduling practices.

MR. KATAEV: Your Honor, can I be heard?

THE COURT: All right. Well, we're not at the collective certification stage or the class stage, and who knows if we will actually get there? But I think to certify a collective you need -- or a class, you would need more than an inference. You would need evidence of a pay practice and sort of the scheduling to get those certified.

MR. KASKE: Correct, Your Honor.

THE COURT: All right. Under my rules, my individual practice rules, I reserve the right to deem motions as having been made on the pre-motion letters, and I will do that here. I'm going to deem the motion to dismiss as having been made, and I'm going to deny it. I think the allegations in the complaint are sufficient to raise a pay frequency claim. And frankly, it would be inefficient to dismiss the --

MR. KATAEV: Fair Workweek.

THE COURT: -- Fair Workweek claims just to send you to state court where you would be likely engaging in a lot of the same discovery. So I will exercise supplemental jurisdiction over the Fair Workweek claims.

You folks have not yet met with Magistrate Judge Eshkenazi, or have you?

MR. KATAEV: We have not.

MR. KASKE: We have not, Your Honor.

THE COURT: Okay. I'm going to ask her to convene an initial conference with you. I would like you to seriously consider consenting to her jurisdiction for all purposes. She's a great magistrate judge and I'm sure she will handle you very well. And also, whether you consent to her jurisdiction or not, you should seriously consider trying to resolve this, short of full-blown litigation.

Have there been any discussions about that?

MR. KATAEV: We've had preliminary discussions, but regrettably, the only discussion Plaintiffs were willing to have were on the class and collective action-wide basis. One of the Plaintiffs worked for a few months in '23. The other one worked for a few months in '21. Client's not prepared to do that.

I would, however, request that the Court consider issuing a mediation referral order to give it the good old college try, because my clients may be willing to not

necessarily agree to a class or collective action-wide settlement, but maybe do a settlement that will make the two Plaintiffs and their attorneys happy enough to do away with that, and would encourage.

THE COURT: Mr. Kaske, do you want to respond to that?

MR. KASKE: Yeah. To just confirm that we had preliminary discussions before filing the lawsuit, given what we were seeking to resolve it and the toll we were looking for and such, conversations broke down and we filed and now here we are. I think we're happy to review potential mediation, but I would suggest that we do that with the magistrate's guidance to work into the magistrate's schedule.

THE COURT: All right. I will leave that to Judge Eshkenazi. I think it's probably a good idea to seriously consider that, whether you mediate on an individual basis or a class-wide basis.

I mean, really, if we're talking about the pay frequency claim, didn't the legislature sort of severely limit the damages that Plaintiffs can get for those claims?

MR. KASKE: Yes. They did. Sixteen percent interest for the duration of the delay.

THE COURT: Which someone who's making minimum wage --

MR. KASKE: It's pennies on the dollar. Yeah.

THE COURT: Yeah. So even if you were to settle on a class-wide basis, really not going to break the bank. I don't know how big these locations are, but you know -- or how many employees they have. So whether you mediate on the class-wide basis or an individual basis, it's not going to be great recovery, I wouldn't think. But talk to Judge Eshkenazi about that. I'm sure she'll pull you in very quickly, so be prepared for a scheduling order.

MR. KASKE: Great. Thank you.

THE COURT: All right? Okay. Anything else?

MR. KASKE: Nothing from Plaintiffs.

MR. KATAEV: Nothing for the Defendants. Thank you, Your Honor.

THE COURT: All right. Thank you folks.

MR. KASKE: Thank you, Your Honor. Thank you, everybody. Take care.

(Proceedings adjourned)

TRANSCRIBER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Laura Hunt August 18, 2025

______________________________ ____________________

Laura Hunt DATE

Legal Transcriber